LUCERO, J.,
joined by Judges HOLLOWAY, HENRY, BRISCOE, and MURPHY, dissenting.
We granted en banc rehearing in this case to reconsider the panel opinion, Zamora v. Elite Logistics, Inc., 449 F.3d 1106 (10th Cir.2006), which dealt with two fact-bound summary judgment issues. First, did Zamora, a United States citizen and apparent victim of identity theft, create a material dispute of fact regarding Elite’s motive for Zamora’s week-long unpaid suspension, given that, on the first day of his suspension, he produced a naturalization certificate consistent with information already in his employment file? Second, did Zamora create a material dispute of fact regarding Elite’s motive for terminating Zamora following his demand for an apology for his suspension?
Anomalously, we are divided seven to seven on whether there is a material dispute of fact regarding the suspension, and thus reinstate the district court’s opinion on that point. Notwithstanding that resulting disposition, a bare majority of our court determines that “[human resources manager Larry] Tucker’s suspending Zamora and his later decision to terminate Zamora’s employment must be viewed as discrete, separate events,” although the two incidents happened just four days apart, and holds that Zamora’s second claim fails as a matter of law. (Maj.Op. 1166.) From the majority’s holding on the latter claim, I respectfully dissent.
The basis of my dissent is that neither the facts nor the law lend themselves to a surgical excision of the two issues in the manner espoused by the majority. Because Zamora’s suspension and termination occurred just days apart and were imposed by the same supervisor, it is inappropriate to ignore the former event when analyzing the latter.
I continue to think it unnecessary to examine the suspension claim in detail because, under our circuit practice, we affirm the district court’s decision without opinion when we evenly divide on the disposition of a claim. Nonetheless, because Judge McConnell’s concurrence[2] chooses to discuss the issue at length, this dissent responds to the McConnell concurrence as well.
*1185 I
This appeal stems from a grant of summary judgment in favor of Elite on both Zamora’s suspension and termination claims. “We review the district court’s grant of summary judgment de novo, applying the same legal standard as the court below.” Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir.2000). Summary judgment is only appropriate “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed.R.Civ.P. 56(c). It is our obligation on appeal to view the evidence and draw reasonable inferences therefrom in the light most favorable to Zamora, the nonmoving party. Munoz, 221 F.3d at 1164. Making these inferences, the facts are as follows.[3]
In 1987 Zamora was granted legal permanent residency in the United States. In August 2001, he was hired by Elite. At that time, Zamora provided Elite with a copy of his social security card and his alien registration card, and completed an 1-9 form attesting that he was a Mexican citizen and lawful permanent resident of the United States. While working for Elite, Zamora became a naturalized citizen.
In December 2001, after receiving a tip that the Immigration and Naturalization Service (“INS”) might inspect its Kansas City location, Elite hired two independent contractors to check the social security numbers (“SSNs”) of all employees at that location.[4] Tucker testified approximately thirty-five or so employees, including Zamora, were identified as having problems as a result of these investigations. A Da-tasource “Background Investigation Report” revealed that an individual in California had used Zamora’s SSN. (Appellee App’x 94, 96.) A second contractor, Verifications, Inc., informed Elite that Zamora’s SSN had “been used by someone else for credit purposes,” and instructed Elite that “[verification through the Social Security Administration itself can only be done by the company that has hired the applicant, by calling 800-772-1213.” (Id. at 97.) Tucker chose not to verify Zamora’s social security status by calling this number at the time. Nor did he bother to look at Zamora’s employment file, which contained Zamora’s 1-9 work authorization form and copies of his social security card and alien *1186 registration card, at any point during the ensuing events. Instead, he presented Zamora with the following memorandum on May 10, 2002:
It is required by federal law that all employees produce documents, which establish them identity and/or employment eligibility to legally work in the United States when they are hired. This eligibility can be established with a U.S. Passport, a Certificate of Citizenship or Naturalization; or with a combination of other documents, such as a state driver’s license, state or federal ID card, U.S. Social Security card and/or a certified copy of a birth certificate, issued by a state of the United States.
It has come to our attention that the documents you provided us previously are questionable. Therefore, we are asking that you obtain proper documentation, or you may not be permitted to continue working here. Please bring proper evidence of your identity and employment eligibility no later than 5:00 p.m. on Monday, May 20, 2002, to the Department of Human Resources, or you may be terminated.
Thank you.
(Appellant Supp. App’x 87.)
Under a part titled “Eligibility Documentation,” the memorandum continued:
I understand and agree that until and if I provide documents, which establish my identity and/or employment eligibility to legally work in the United States, Elite Logistics may not be able to continue permitting me to work. I also understand and agree that I have until 5:00 p.m. on Monday, May 20, 2002, to produce this documentation.

(Id.)

Although Zamora did not provide the requested documentation by May 20, he attempted to comply with Elite’s request immediately after Tucker suspended him on May 22, thereafter presenting additional materials on numerous occasions.[5] On the day of his suspension, Zamora presented Tucker with a report of his earnings from the Social Security Administration (“SSA”), his social security card, and an INS document showing that he had applied to become a naturalized citizen in 2001. The INS form provided a customer service number, but Tucker did not call that number. The SSA earnings report issued for an “R. Zamora” listed a birth date of “2/1960,” conflicting with the document plaintiff had provided to Elite when hired, showing a birth date of June 14, 1961. By Tucker’s own admission, receipt of these documents alleviated his concern about Zamora’s right to work in this country.
Nonetheless, Tucker chose not to end Zamora’s suspension without pay and instead demanded more documentation, allegedly due to Tucker’s concerns about the birth-date discrepancy between Zamora’s SSA earnings record and Elite’s files. Zamora returned to Elite once again with a copy of his naturalization certificate, a document that Elite had identified as sufficient to show lawful work status in its May 10 memorandum.[6] Tucker not only rejected this certificate; he accused Zamora of stealing someone else’s SSN and told Za *1187 mora to bring a different social security number than provided at hiring. Finally, Zamora brought in a letter from the SSA bearing the stamp of the agency and verifying that the SSN he provided was assigned to “Ramon Zamora Farias,” the name Zamora had given Elite at hiring. Once again, Tucker was not satisfied. Only after Tucker had his secretary confirm the legitimacy of this letter by then placing a phone call to the SSA, did he allow Zamora to return to work.
On May 29, Zamora entered Tucker’s office and handed him a letter that demanded both an apology and an explanation. Tucker described Zamora as “very polite” in tendering this letter. Although fully cognizant that Zamora had been lawfully entitled to work during his entire week-long suspension, Tucker refused to apologize, fired Zamora, then instructed him to “get the hell out.” Later, Tucker testified that he was “shocked” that Zamora would request an apology and never bothered to consider why Zamora would desire an apology.
II
Congress enacted Title VII to “eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens.” McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Because it is so difficult to ferret out national origin bias, we must often rely on circumstantial evidence in deciding such claims. However, the persuasive value of such evidence cannot be discounted. “Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.” Rogers v. Mo. Pac. R., 352 U.S. 500, 508 n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957); see also Desert Palace, Inc. v. Costa, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).
For both Zamora’s suspension and termination claims, we follow the three-step framework set forth in McDonnell Douglas for summary judgment cases based on circumstantial evidence. A plaintiff must first plead a prima facie case of a discriminatory employment action. Thereafter, the burden shifts to the employer “to articulate some legitimate nondiscriminatory reason for the employee’s rejection.” Id. at 802, 93 S.Ct. 1817. Once the employer does so, the plaintiff must offer evidence showing that the proffered reason is pre-textual.
Although half of the members of this court agree that Zamora presented sufficient evidence of pretext as to his continued suspension, the majority opinion concludes that the record contains no evidence that Tucker terminated Zamora because Zamora was a “Mexican-born Hispanic.” (Maj.Op. 1167.) This ignores the events surrounding Zamora’s suspension, which had ended a mere four days before. We have stated that “evidence of the employer’s general discriminatory propensities may be relevant and admissible to prove discrimination.” Mendelsohn v. Sprint United Mgmt. Co., 466 F.3d 1223, 1226 (10th Cir.2006). Moreover, “[e]vidence of pretext may include ... prior treatment of plaintiff.” Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1217 (10th Cir.2002) (quotation omitted). I fail to understand how we can be evenly divided over whether Tucker was motivated by racial bias against Mexican-Amerieans on May 25, and yet issue a majority opinion concluding that Tucker had no racial motivations as a matter of law on May 29.
The majority cites our recent decision in Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir.2006), for the proposition that Tucker’s decision to allow Zamora to return to work raises a “strong inference that the employer’s stated reason for *1188 acting against the employee is not pretex-tual.” (Maj.Op. 1167.) From there, the majority jumps to the conclusion that “Tucker’s suspending Zamora and his later decision to terminate Zamora’s employment must be viewed as discrete, separate events.” Id. At no point in Sygma Network did the court so hold. In fact, the guiding principals underlying the holding of Sygma Network are that an individual can be assumed to maintain the same views for a relatively short period in time, and that decisions proximate in time and made by the same person may be viewed to establish common context. Zamora’s suspension, permission to return to work, and termination all took place within a span of days and were all decided by Tucker. Thus, notwithstanding the grant of permission to return to work, there is no principled reason to view the suspension and termination as “discrete, separate events.” Unlike the instant case, the plaintiff in Sygma Network offered no evidence that her employer engaged in arguably discriminatory conduct towards her just days before the termination.[6] When such evidence exists, Sygma Network offers no guidance.
Even more problematic is the majority’s bald assumption, again purportedly underpinned by Sygma Network, that “[i]f Tucker was discriminating against Zamora based upon his race or national origin, Tucker would not have reinstated him.” (Maj.Op. 1167.) This statement is not only speculative, but also permits employers to easily insulate themselves against discriminatory termination claims. Under the majority’s formulation, an employer who wished to fire an employee for invidious reasons could do so without fear of legal action simply by suspending and reinstating the employee before terminating him. To the extent that the majority holds that Tucker’s grudging permission for Zamora to return to work cleans the slate of all evidence of discriminatory motive, including the circumstances surrounding Zamora’s suspension, I disagree.[7]
Ill
Although the concurrence would hold that Zamora’s suspension claim fails as a matter of law, in my view Zamora has presented sufficient evidence to survive summary judgment on this claim. The parties do not dispute that Zamora has satisfied the first step of McDonnell Douglas by pleading a prima facie case of discriminatory suspension. Therefore, the burden shifted to Elite to articulate a legitimate nondiscriminatory reason for its actions. Elite contends it was merely attempting to comply with IRCA in suspending Zamora for approximately a week without pay. This case is accordingly decided at the last step of McDonnell Douglas, in which Zamora must offer evidence *1189 showing that the proffered reason is pre-textual.
A
Because Tucker effectively conceded that his actions were not driven by IRCA — he admitted he no longer had concerns about Zamora’s right to work in this country as of May 22, 2002 — I see little merit in providing an in-depth discussion of the statute. Nevertheless, because I differ greatly from the concurrence in my view of IRCA’s requirements and restrictions, I briefly outline my thoughts on this matter.
IRCA was designed to curb the influx of undocumented immigrants by creating a regime of sanctions against employers that hire them. Toward this end, the Act requires employers to verify the identity and eligibility of employees at the time of hiring by examining certain documents. 8 U.S.C. § 1324a(a)(l)(B), (b). Well-meaning employers are provided with significant legal protection at the hiring stage because they are allowed to assert “good faith” compliance with IRCA as an affirmative defense to liability. Id. § 1324a(a)(3). IRCA also declares that requesting “more or additional documents” at hiring than those specifically identified in the Act “shall be treated as an unfair immigration-related employment practice.” Id. § 1324b(a)(6). After the employment relationship is established, IRCA makes it unlawful to “continue to employ [an] alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.” Id. § 1324a(a)(2).
Employer sanctions, however, represent only one side of the IRCA coin. When IRCA was initially debated, advocates and members of Congress voiced widespread concerns that the Act would become a tool of invidious discrimination against Hispanic-Americans and other minorities. Although the original bill introducing IRCA did not contain strong anti-discrimination measures, the full House voted to include a significant anti-discrimination amendment. See H.R.Rep. No. 99-682(11) (1986), pt. 2, at 12 (1986), reprinted in 1986 U.S.C.C.A.N. 5757, 5761. Explaining its support for this amendment, the House Committee on Education and Labor stated:
The [committee] strongly endorses [the anti-discrimination amendment] and ... has consistently expressed its fear that the imposition of employer sanctions will give rise to employment discrimination against Hispanic Americans and other minority group members. It is the committee’s view that if there is to be sanctions enforcement and liability there must be an equally strong and readily available remedy if resulting employment discrimination occurs.

Id.

In adopting the House amendment to the bill, the Joint Senate and House Conference Committee (“Conference Committee”) agreed “[t]he antidiscrimination provisions of this bill are a complement to the sanctions provisions, and must be considered in this context.” H.R. Conf. Rep. No. 99-1000 (1986), reprinted in 1986 U.S.C.C.A.N. 5840, 5842. It went on to explain that the provisions “broaden[] the Title VII protections against national origin discrimination, while not broadening the other Title VII protections, because of the concern of some Members that people of ‘foreign’ appearance might be made more vulnerable by the imposition of sanctions.” Id. (emphasis added).
Because members of Congress believed that IRCA might not in fact prompt employers to discriminate and the anti-discrimination provisions could thus be unnecessary, the Conference Committee adopted a clause providing, “[t]he antidis-crimination provisions would ... be re *1190 pealed in the event of a joint resolution approving a [General Accounting Office] finding that the sanctions had resulted in no significant discrimination.” Id. at 5843; see 8 U.S.C. § 1324b(k)(2). In 1990, the General Accounting Office (“GAO”) released a report to Congress, finding IRCA had indeed resulted in a “serious pattern” of national origin discrimination. GAO, Employer Sanctions and the Question of Discrimination 5 (1990) (“GAO estimates that 461,000 (or 10 percent) of the 4.6 million employers in the survey population nationwide began one or more practices that represent national origin discrimination”). Thus, IRCA — as enacted, and as it stands today — declares that “[i]t is an unfair immigration-related employment practice for a person or other entity to discriminate against any individual ... with respect to the hiring, or recruitment or referral for a fee, of the individual for employment or the discharging of the individual from employment ... because of such individual’s national origin.”[8] 8 U.S.C. § 1324b(a)(l)(A).[9]
The concurrence would go far in insulating employers from national origin discrimination claims. It suggests that because employers face sanctions for knowingly continuing to employ unauthorized aliens, employers should be given a virtual safe-harbor against Title VII claims for investigating an employee, so long as they cite IRCA to defend their actions. Assuredly, employers should undertake meaningful investigation if an employee’s lawful work status is legitimately called into question. However, fear of sanction for “knowing” employment of unauthorized aliens cannot justify discriminatory precautionary measures. Indeed, regulations implementing IRCA expressly warn employers:
Knowledge that an employee is unauthorized may not be inferred from an employee’s foreign appearance or accent. Nothing in [the definition of knowing] should be interpreted as permitting an employer to request more or different documents than are required under section 274A(b) of the Act or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual.
8 C.F.R. § 274a.l(l)(2).[10]
Adopting the concurrence’s approach would undoubtedly narrow the scope of *1191 recovery for national origin discrimination claims. This result thwarts Congress’s clear intent in passing IRCA to “broaden[ ] the Title VII protections against national origin discrimination” and to prescribe a “strong and readily available remedy” for such discrimination. H.R. Conf. Rep. No. 99-1000 (1986), reprinted in 1986 U.S.C.C.A.N. 5840, 5842; H.R.Rep. No. 99-682(11) (1986), pt. 2, at 12 (1986), reprinted in 1986 U.S.C.C.A.N. 5757, 5761. Due consideration of IRCA does not and should not preclude examination of whether Zamora presented evidence sufficient to reach a jury on his Title VII claims.
B
As explained above, this ease is decided at the last step of the McDonnell Douglas framework. “ At this stage we determine whether a plaintiff has produced sufficient evidence from which a jury could conclude that the employer’s proffered reason for the adverse employment action is pretext.”[11] Pretext may be established by showing “such weaknesses, implausibilities, inconsistencies, incoheren-cies, or contradictions in the employer’s proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.” Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997) (quotations and citations omitted). Although there is no standard method for proving pretext, plaintiffs generally rely on three types of evidence: (1) evidence that the defendant’s proffered reason was false, (2) evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances, or (3) evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir.2000).
Zamora has consistently argued that Elite’s proffered reason for his suspension — a desire to verify Zamora’s right to work in the United States — is pretextual. In support of his allegation of pretext, he identifies four pieces of evidence. First, Zamora points to Tucker’s own admission that concern over Zamora’s right to work did not underlie his decision to continue Zamora’s suspension. Zamora contends that this admission demonstrates that Tucker did not have a good faith belief in the proffered justification of IRCA compliance. Second, Zamora notes that Elite’s May 10, 2002 written memorandum informed him that a naturalization certificate would be sufficient to clear up concerns over his work status. In rejecting Zamo *1192 ra’s proffer of a naturalization certificate, Elite thus violated its own written policy. Third, although a neutral decisionmaker would realize the fact that someone else had used Zamora’s SSN did not resolve whether Zamora was the perpetrator or the victim of identity theft, Zamora testified that Tucker accused him of stealing someone else’s SSN despite Zamora’s protestations to the contrary. Tucker’s immediate conclusion that Zamora stole his SSN could reasonably support an inference of discriminatory intent on the part of Tucker. Finally, Zamora has shown that Elite has acted contrary to its alleged good-faith attempt to comply with IRCA, even during the period of his suspension. After Zamora vigorously asserted that his original social security number was correct and true, Tucker instructed Zamora to return to him with a different SSN. Together this evidence demonstrates “weaknesses, implausibilities, inconsistencies, incoheren-cies, or contradictions” in Elite’s proffered reason of IRCA compliance, such that a reasonable factfinder could find that reason “unworthy of credence.” Morgan, 108 F.3d at 1323.
The concurrence ignores the last two showings in its discussion and seeks to discredit the first two pieces of evidence by interpreting them in “context.” The concurrence first attempts to undermine Tucker’s admission. On this point, Tucker testified:
Q: And the reason [a document from the INS that shows Zamora applied for naturalization did not satisfy you] is because it does not explain away the concerns you had about his social security number?
A: That is correct.
Q: Okay. So would it be fair to say that the problem with the social security number is that it points to a potential that, in fact, [Zamora] is not entitled to work in this country?
A: What I had was a social security number that indicated three different people may have used the number at three different points in time. I wanted to ascertain with certainty that that number belonged to Mr. Zamora.
Q: Okay. So, it wasn’t really a concern about whether [Zamora] is entitled to work in this country, it was a concern about is he using the correct social security number?
A: Yes, sir.
(Appellant Supp. App’x 67.) Making all reasonable inferences in favor of Zamora, this exchange may be reasonably interpreted as a concession by Tucker that he was not concerned with Zamora’s lawful right to work in this country as of May 22, 2002. Tucker’s answers to both the second and third questions demonstrate that he viewed his concern with Zamora’s lawful work status as distinct from a concern with the validity of his SSN.[12] From this exchange, a reasonable factfinder could de *1193 termine that Tucker was not concerned about Zamora’s right to work when he prolonged Zamora’s suspension.
Although it cannot escape Tucker’s own admission, the concurrence appears to argue: (1) because Tucker had concerns about whether Zamora was using someone else’s SSN, Tucker must have doubted Zamora was the person identified by his documents; and (2) because IRCA mandates an employer to confirm both identity and work eligibility, Tucker’s SSN concern was equivalent to his concern over IRCA compliance. (Concurring Op. 1178-80.) Both arguments are justified by the concurrence as providing “context.” However, attributing this understanding to Tucker requires a tortured reading of his deposition testimony. It is true that IRCA necessarily concerns an individual’s identity, to the extent that an employee must establish that she is the person named in her work-authorization document. But unless Tucker believed that the work-authorization documents presented by Zamora on May 22, 2002 in fact identified Zamora, his concern over Zamora’s right to work could not reasonably have been alleviated by those documents. Tucker clearly stated that as of May 22, 2002, he was not concerned about Zamora’s right to work in this country but was concerned about Zamora’s use of a correct SSN. To conflate these concerns ignores both Tucker’s testimony and our obligations to the non-moving party at the summary judgment stage.
In addition, the concurrence also attempts to explain away the fact that Elite contravened written policy in rejecting Zamora’s proffer of a naturalization certificate. It concedes that “the Elite memorandum, read in isolation, might suggest some sort of inconsistency,” but proceeds to draw inferences and make arguments in favor of Elite. (Concurring Op. 1180.) Because the memorandum noted that Zamora’s documents were questionable, and because Zamora was told he needed to clear up the “discrepancy,” the concurrence claims inconsistency between Tucker’s actions and the memorandum should be overlooked.
The contextual hues lent by the concurrence amount to impermissible inferences drawn in favor of Elite.[13] Although these arguments may persuade a jury, our role as judges at the summary judgment stage requires us to accept Zamora’s competing, plausible interpretations of the evidence. Because I differ with the concurrence in considering the facts in the light most favorable to Zamora, I conclude that a reasonable jury could find Elite’s proffered reason of IRCA compliance is pretextual.
Judges HOLLOWAY, HENRY, BRISCOE, and MURPHY join in this dissent.

. Because we have split evenly on the disposition of Zamora's suspension claim, the court has issued no opinion to which a concurrence may properly be addressed, particularly so given that the "concurrence” is directly contrary to the vote on the suspension claim of the author of the majority opinion. I find no precedent for the issuance of a concurrence to an evenly divided en banc judgment. Notwithstanding disagreement with the characterization of Judge McConnell’s discourse as a concurrence, this dissent refers to Judge McConnell's discussion of the suspension claim as "the concurrence.”

. The concurrence implicitly argues this dissent incorrectly portrays “a hapless employee repeatedly offering sound documentation of his work status, and just as often being senselessly (or invidiously) rebuffed.” (Concurring Op. 1168.) On the contention that this "is scarcely a fair description of what occurred,” (id.), it then advances an alternative factual scenario. The concurrence depicts an employer attempting to comply with the Immigration Reform and Control Act of 1986 ("IRCA”) and to maintain operations after it faced a worker strike which "necessitated the rushed hiring of about three hundred replacement employees,” (id. at 2-5), and an employee who ignored the company's minimal requests.
For the most part, I do not disagree with the concurrence's description of the events leading up to Zamora’s initial meeting with Tucker. We mainly differ, however, in our portrayal of the events after this meeting. Both find factual support in the record, but this dissent makes reasonable inferences as required by law, while the concurrence advances the defendant's view of the facts. Using the term "context,” the concurrence discredits evidence that a reasonable juror could view as supporting Zamora. In my view, these contextual arguments are simply impermissible inferences.

. In response to a Summer 2000 worker strike, Elite hurriedly hired approximately 300 replacement employees. During this time, it operated under a "get a body in the door” policy that blatantly disregarded IRCA requirements.

. The exact order of the following events is unclear from the record, but, as did the district court, this dissent assumes the order occurred in the light most favorable to Zamora.

. Tucker testified that he did not recall receiving this document; Zamora, however, vigorously asserts that he presented Tucker with a naturalization certificate. Because we view the facts in the light most favorable to Zamora, we assume that he did so. As required by statute, a naturalization certificate must include a photograph and the age of the naturalized person. 8 U.S.C. § 1449.

. Although the plaintiff produced evidence that her supervisor made an arguably racial comment regarding the plaintiff’s body odor ten months prior to termination, we held that this remark was an isolated comment too remote in time to overcome pretext. Sygma Network, 458 F.3d at 1184. In Zamora’s case, the suspension without pay was more significant than an isolated comment with no adverse consequences and occurred just days before his termination.

. The concurrence expresses concern that our approach would allow “essentially any victim of a discriminatory adverse employment action that fell short of termination [to] morph his grievance into a more lucrative wrongful termination claim by presenting his employer with an ultimatum.” (Concurring Op. 1182.) I share neither the concurrence’s fear of the consequences of this dissent's suggested holding nor its jaundiced view of Title VII plaintiffs. In this case, Zamora was fired before he could resign. Had Zamora resigned, he could not have established a prima facie case of wrongful termination under Title VII.

. Although the concurrence looks to numerous external sources, including the New York Times, to illuminate the purposes and effects of IRCA, it neglects to carefully consider the anti-discrimination provisions of IRCA itself. It maintains that because "Zamora has not pursued" the administrative procedures set forth in § 1324b, “[t]hese provisions are thus not at issue in this case.” (Concurring Op. 1174, n. 7.) IRCA expressly provides that these procedures apply only to claims that cannot be brought under Title VII. 8 U.S.C. § 1324b(a)(2)(B). Although I agree that the anti-discrimination provisions have not been directly placed at issue in this case, these provisions are indispensable in any serious discussion of the Act.

. I do not suggest that IRCA’s anti-discrimination provisions necessarily guide our analysis. This dissent merely points out that allowing employers to cite IRCA concerns as a shield against Title VII claims is not contemplated by IRCA itself.

.As the concurrence notes, some courts have held that employers violate § 1324a(a)(2) when they have "constructive knowledge” of an employee's unauthorized work status and yet continue to employ that individual. See, e.g, New El Rey Sausage Co., v. INS, 925 F.2d 1153, 1157-58 (9th Cir.1991). However, no court has held that a credit check revealing only that an employee's SSN was used by another person constitutes "constructive knowledge” of a person’s unauthorized work status. Nor do the government's actions under IRCA support this broader view of "constructive knowledge.” The concurrence suggests that the government's adoption of social security verification in its Basic Pilot Program supports Elite's *1191 actions. (Concurring Op. 1174-75.) To the contrary, this argument ignores significant differences between the government’s Basic Pilot Program, which requires employers to verify employee SSNs with the federal government, and the ad hoc approach used by Elite. At no point before Zamora's suspension did Elite or anyone else attempt to verify Zamora’s SSN by contacting the Social Security Administration ("SSA”). Instead, Elite hired independent contractors to run checks on his SSN information. Only the SSA can conclusively identify the proper holder of a given SSN' — recognizing this, the independent contractor employed by Elite instructed the company to verify the number with the SSA and provided a telephone number for the agency.

. Contrary to the concurrence’s suggestion, a showing of pretext alone will generally suffice. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (“[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.”); Randle v. City of Aurora, 69 F.3d 441, 451-53, 452 n. 16 (10th Cir.1995).

. Other evidence in the record corroborates that Tucker did not equate his concern about an incorrect SSN with concern over Zamora's showing of identity under IRCA. Tucker testified that an employee could establish identity for the purposes of IRCA by presenting a valid document with a photograph:
Q: So if you have a driver’s license or some other kind of approved document with your photograph on it, that might comply with the identification requirement, correct?
A: That is correct.
Q: But that would not necessarily comply with the right-to-work requirement?
A: That is correct.
Q: And for the right-to-work requirement, there are other documents set out in the 1-9 form that are acceptable for an employer?
A: Yes, sir.
Q: And one of those is a social security card issued by the Social Security Administration?
A: That’s correct.
(Appellant Supp. App’x 51.) Tucker later emphasized that he understood that identity theft did not implicate a person’s right to work:
Q: Okay. Would you agree with me that it was also possible that somebody else was *1193 illegally using Mr. Zamora’s social security number.
A: Yes, sir. It’s entirely possible.
Q: If that was the case, then that would not affect his right to work or should not affect his employment status at Elite at all, should it?
A: That is correct.
(Appellant Supp. App’x 72.)

. I do not suggest that deposition statements should never be considered in context. In fact, the deposition testimony in footnote twelve of this dissent is cited to provide context for Tucker’s statement admitting that he no longer had concerns over Zamora’s right to work and drawing a distinction between that concern and the SSN issue. However, the concurrence improperly cites context to discredit showings of pretext that reasonably support the non-moving party, even in light of all the evidence.