**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 15, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JAMIE K. SANDERS, an individual;
DENISE J. COFFEY, an individual;
KARIE H. BROOKS, an individual,

      Plaintiffs - Appellants,

v.

SOUTHWESTERN BELL
TELEPHONE, L.P., a Texas
corporation; SOUTHWESTERN BELL
COMMUNICATIONS,

      Defendants - Appellees.

No. 06-5199

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D. Ct. No. 4:03-CV-00452-CVE-FHM)**

---

N. Kay Bridger-Riley, Bridger-Riley & Associates, P.C., Tulsa, Oklahoma, for
Plaintiffs-Appellants.

Mary L. Lohrke (Kimberly Lambert Love with her on the brief), Titus, Hillis,
Reynolds, Love, Dickman & McCalmon, Tulsa, Oklahoma, for
Defendant-Appellee.

---

Before **TACHA**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

---

**TACHA**, Circuit Judge.

Plaintiffs-Appellants Jamie Sanders, Denise Coffey, and Karie Brooks appeal the district court's entry of summary judgment in favor of Defendant-Appellee Southwestern Bell Telephone, L.P. ("SWBT") on their claims of age and sex discrimination. They also appeal the court's dismissal of co-defendant Southwestern Bell Communications ("SBC") for improper service. We have jurisdiction under 28 U.S.C. § 1291, and we AFFIRM in part and REVERSE in part.

## I. BACKGROUND

SWBT experienced a significant loss in customers after September 11, 2001. As a result, SWBT's Oklahoma Construction and Engineering ("C&E") organization underwent three separate reductions in force ("RIFs") of first-level managers. The RIFs were conducted in the fall of 2001, spring of 2002, and fall of 2002. The plaintiffs survived the first two RIFs but not the third, which is the only RIF at issue in this appeal.

Dan McNeely headed the Oklahoma C&E organization during the fall 2002 RIF. First-level managers in the Oklahoma C&E organization reported to their Area Managers, who in turn reported to Mr. McNeely. In the fall of 2002, SWBT determined that the Oklahoma C&E organization had twenty-two first-level managers and one Area Manager more than business needs required. The

plaintiffs do not dispute the business necessity of the resulting RIF.

SWBT's Management Staffing Guidelines ("MSG") set forth procedures for conducting RIFs. As part of the fall 2002 RIF, and in accordance with the MSG, all first-level managers in the Oklahoma C&E organization were first grouped by job title and work location. Mr. McNeely, with input from the Area Managers, then determined the geographic areas where a smaller number of managers could handle the existing workload. The groups with surplus workers, or "affected work groups," included Managers-Engineering in the Oklahoma City/Stillwater area, Managers-Construction in the Oklahoma City/Stillwater area, and Managers-Engineering in the Enid area.

To determine which managers would be selected for the RIF, and consistent with the MSG, managers in each affected work group were placed into one of four "bands"—Bands A, B, C, and D—based on their most recent performance evaluations. Band A was the highest; Band D was the lowest. No manager within any affected work group, however, fell into Band D.

Next, five Area Managers ranked all Band C managers in each affected work group against one another. Those managers who ranked lower than the number of managers designated for retention in the affected work group were considered to be "at risk" for a layoff, or "surplus." The highest-ranked at-risk manager, however, could be "saved" from being laid off if a higher-ranked

manager in her affected work group either voluntarily quit or accepted a job in a non-affected work group, or a different organization within the company.

As a Manager-Engineering in the Oklahoma City/Stillwater area, Ms. Sanders fell into an affected work group. She was placed into Band C based on her 2001 performance evaluation. Sixteen other people in this affected work group were also placed into Band C. The five Area Managers ranked Ms. Sanders fifth from the bottom. Because only four managers were designated as surplus, Ms. Sanders was not considered to be at risk at that time. Later, however, and pursuant to the MSG, one Area Manager accepted a voluntary demotion to Manager-Engineering. This demotion necessitated the layoff of an additional manager from this affected work group, which caused Ms. Sanders to be at risk for surplus.[1]

Ms. Coffey's position was in the affected work group consisting of Managers-Construction in the Oklahoma City/Stillwater area. Her most recent performance evaluation placed her in Band C. The Area Managers ranked Ms. Coffey last out of the six people in Band C, which put her at risk of being

---

[1]At the time of the ranking meeting, the seventeen managers in Band C ranged in age from forty-two to fifty-five. Ms. Sanders was forty-eight. She was younger than each person ranked below her, and she was younger than half of the people ranked above her. Indeed, the top-four-ranked individuals were all older than Ms. Sanders. Of the seventeen total managers, five (including Ms. Sanders) were women. Two women were ranked above Ms. Sanders; two were ranked below her. Thus, all but two of the men were ranked above Ms. Sanders.

surplussed.[2]

Ms. Brooks was one of two people in the affected work group consisting of Managers-Engineering in the Enid area. She was placed in Band C; the other manager, a younger man, was placed in Band B. Because it had previously been determined that one person in this work group would be laid off, Ms. Brooks was considered at risk.

On November 13, 2002, Ms. Sanders and Ms. Brooks met individually with their supervisor, Area Manager Rick Wooten. Ms. Coffey met with her supervisor, Area Manager Mike Harris. The supervisors informed the plaintiffs that their positions were being eliminated or consolidated with another position, and gave them the option of either terminating their employment immediately or staying on for thirty days to apply for other positions within the company. According to Ms. Sanders, Mr. Wooten told her during this meeting that she was being surplussed because of her age.

Ms. Sanders ultimately accepted another position with SWBT in Plano, Texas. Ms. Coffey and Ms. Brooks were unable to locate another position and were laid off in December 2002. Ms. Sanders was forty-eight years old, Ms. Coffey was forty-five, and Ms. Brooks was fifty-six.

---

[2]At the time of the ranking meeting, the six managers in Band C ranged in age from forty-five to fifty-five. Ms. Coffey was the youngest, and she was the only woman.

The plaintiffs filed suit against SWBT and SBC, alleging that they were surplussed because of their age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and because of their sex in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. After discovery, SWBT and SBC moved for summary judgment. Before ruling on the motion, the district court sua sponte dismissed SBC for insufficient service of process. The court then granted summary judgment in favor of SWBT, reasoning that the plaintiffs had failed to demonstrate that SWBT's nondiscriminatory justification for their layoffs was pretextual. The plaintiffs appeal the order of summary judgment and the dismissal of SBC.[3]

## II. SUMMARY JUDGMENT

A.      Standard of Review

We review summary judgment decisions de novo, applying the same legal standard as the district court. *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). Summary

---

[3]The plaintiffs' complaint asserts several additional claims, all of which were either dismissed under Fed. R. Civ. P. 12(b)(6) or decided in favor of SWBT in the district court's summary judgment order. The plaintiffs have explicitly abandoned most of those claims on appeal. The two claims which the plaintiffs have not explicitly abandoned—a common-law tort claim, *see Burk v. K-Mart Corp.*, 770 P.2d 24 (Okla. 1989), and Ms. Coffey's sex-discrimination claim based on equal pay—are waived due to inadequate briefing on appeal. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 841 (10th Cir. 2005).

judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms*, 165 F.3d at 1326.

B.      Proof of Discrimination

A plaintiff alleging discrimination may prove her case by direct or circumstantial evidence. *See Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000). Direct evidence is evidence from which the trier of fact may conclude, without inference, that the employment action was undertaken because of the employee's protected status. *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) ("Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.") (quotations omitted). For example, we have stated that an employer's policy, discriminatory on its face, is direct evidence of discrimination. *See Ramsey v. City and County of Denver*, 907 F.2d 1004, 1007–08 (10th Cir. 1990).

Usually, however, a plaintiff will not have direct evidence of discrimination and will establish her claims through circumstantial evidence. In that instance, we analyze the plaintiff's claims under the *McDonnell Douglas* framework to determine whether the defendant is entitled to summary judgment. *See*

-7-

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Adamson v. Multi Community Diversified Servs., Inc.*, 514 F.3d 1136, 1145–46, 1148 (10th Cir. 2008) (applying *McDonnell Douglas* to discrimination claims brought pursuant to the ADEA and Title VII).   Under the *McDonnell Douglas* analysis, a plaintiff "bears the initial burden of setting forth a prima facie case of discrimination." *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998).  After the plaintiff makes a prima facie case, the burden shifts to the employer to give a legitimate, nondiscriminatory reason for its employment decision.  *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).  "If the employer comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* (quotations omitted).  A plaintiff who demonstrates pretext gets "over the hurdle of summary judgment." *Id.*

1.

Ms. Sanders has produced direct evidence that she was surplussed because of her age.  She testified that Mr. Wooten, who had been part of the team responsible for ranking her fifth from the bottom among Band C managers in her affected work group, told her that her age—not her job performance—was the cause of her surplus.

It is undisputed that when Mr. Wooten informed Ms. Sanders that her job was being eliminated, he provided her with a document that listed, by job title and age, the number of employees selected for layoff and the number who were being retained. This information is required to be given to employees by the Older Workers Benefit Protection Act, which is part of the ADEA. According to Ms. Sanders, however, and contrary to the purpose of the ADEA paperwork, Mr. Wooten pointed to the document, explained that she was being surplussed because of her age, and stated that this was necessary to prevent age discrimination.

Although SWBT has put forth evidence that calls Ms. Sanders's recollection of events into question, it is not our province at the summary judgment stage to weigh the evidence or make credibility determinations. *Utah L'house Ministry v. Found. for Apologetic Info. & Rsch.*, 527 F.3d 1045, 1050 (10th Cir. 2008). If the jury believes Ms. Sanders's testimony, it could conclude—directly, without the aid of any favorable inferences—that the reason for her surplus was her age. Accordingly, SWBT is not entitled to summary judgment on Ms. Sanders's age-discrimination claim.[4]

---

[4]The district court concluded that "[g]iven the different versions of this conversation between Wooten and Sanders, this evidence is at most circumstantial." The court then analyzed Ms. Sanders's age-discrimination claim under the *McDonnell Douglas* framework and held that Ms. Sanders had not met her burden to show that SWBT's reason for surplussing her was pretextual. Because Mr. Wooten's alleged statement is direct—not circumstantial—evidence

(continued...)

2.

The plaintiffs' remaining claims are supported by circumstantial evidence and therefore must be analyzed under *McDonnell Douglas*. As to these claims, we agree with the district court that the plaintiffs have established prima facie cases of both sex discrimination and age discrimination.[5] We also agree with the district court that SWBT has articulated a legitimate, non-discriminatory reason for the plaintiffs' surplus: the RIF. The central issue in this appeal, then, is whether the plaintiffs have provided evidence of pretext. We conclude they have not.

Generally, "[a] plaintiff demonstrates pretext by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

---

[4](...continued)
of age discrimination, the district court erred in analyzing her claim under *McDonnell Douglas*.

[5] All three plaintiffs are women. All received performance evaluations rating them as "average" and praising specific efforts each had made. All three were surplussed, causing them to leave an affected work group in which SWBT retained at least one male manager. The three plaintiffs thus have established a prima facie case of discrimination based on sex. *See Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998). As to Ms. Coffey's and Ms. Brooks's age discrimination claims, because both plaintiffs are also over the age of forty and left affected work groups in which a significantly younger manager was retained, they have similarly established a prima facie case of age discrimination. *Id.*

reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) (quotations omitted). When the employer's proffered reason for its action is a RIF, evidence tending to show that the RIF is merely a pretext for the plaintiff's surplus may take several forms. First, the evidence may demonstrate that the plaintiff's surplus is inconsistent with the RIF criteria articulated by her employer. *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1168 (10th Cir. 1998); *see also Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 (10th Cir. 1993) ("It is conceivable that a plaintiff . . . could be so overwhelmingly better qualified than another applicant that on this evidence alone a trial court could properly find pretext"); *Beaird*, 145 F.3d at 1169 (citing *Sanchez* for the proposition that "[t]here may be circumstances in which a claimed business judgment is so idiosyncratic or questionable that a factfinder could reasonably find that it is pretext for illegal discrimination."). Relatedly, evidence showing that the employer inconsistently applied its RIF criteria may also support a finding that the plaintiff was terminated for discriminatory reasons. *See Beaird*, 145 F.3d at 1173–74. Other procedural irregularities in the RIF process may similarly evince unlawful discrimination. *See Whittington v. Nordam Group Inc.*, 429 F.3d 986, 994 (10th Cir. 2005). This, of course, is not an exhaustive list of the types of

evidence that may support a finding of pretext, and we do not limit a plaintiff to any particular method of proof. Rather, when assessing whether a plaintiff has demonstrated pretext such that a jury could conclude that discrimination was the true reason for the adverse employment action, we consider the evidence as a whole. *See Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002).

We understand the plaintiffs in this case—either individually or together—to argue that the RIF was only a pretext for unlawful discrimination because: (1) their qualifications did not warrant their placement in Band C; (2) SWBT inconsistently applied its ranking criteria; (3) an Area Manager was permitted to take a voluntary demotion that resulted in Ms. Sanders's job loss; and (4) women and older employees were disproportionately affected by the RIF.

*Band Placement*

Ms. Sanders and Ms. Brooks contend that SWBT was not justified in placing them in Band C based on their performance and qualifications relative to employees who were placed in higher bands. It is undisputed, however, that SWBT determined band placement based on an employee's most recent performance evaluation; that a notation on the performance evaluation from the employee's manager stating that the manager "concur[s] with [the employee's] accomplishments as written or the achievements as documented" was viewed by the Area Managers as demonstrating average performance warranting placement

in Band C; and that the performance evaluations of Ms. Sanders and Ms. Brooks contained this notation. Unlike the evaluations of managers who were placed in Band A or Band B, neither of these plaintiffs' evaluations included comments from their supervisors indicating their performance was "superior or "above average as compared to his/her peers." To the extent these plaintiffs contend that they are more qualified or for other reasons should have been placed in a higher band, we have held that "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance," *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 988 (10th Cir. 1996), and that a plaintiff "cannot defeat summary judgment by claiming that she would have been retained if different RIF criteria had been used." *Beaird*, 145 F.3d at 1169. Thus, the plaintiffs' claims on this point are not sufficient to demonstrate pretext.

Because this is Mrs. Brooks's only argument on pretext, we affirm the district court's entry of summary judgment on both her age and sex discrimination claims. Further, because Ms. Coffey was the youngest person in the construction group's Band C, and because there is no evidence that her band placement was determined by her age, we affirm the district court's entry of summary judgment

on her age discrimination claim.[6]  Thus, the only remaining claims are Ms.

Sanders's and Ms. Coffey's sex discrimination claims.

*Inconsistent Application of RIF Criteria*

---

[6]Ms. Coffey contends that her job title (and resulting function) was different from other job titles included in her affected work group.  Although not acknowledged by Ms. Coffey, we have stated that pretext may be shown by evidence that the employer designed a RIF to impact certain protected employees—which may be the case when an employer limits the RIF to certain groups of employees without articulating a rational justification for those categorizations.  *See Beaird*, 145 F.3d at 1170–71.  If that were the case here, the fact that Ms. Coffey was the youngest employee in Band C would not be sufficient to entitle SWBT to summary judgment on her claim of age discrimination.  But Ms. Coffey has not put forth any evidence that SWBT did not consider her job to be equivalent to others it included in the affected work group of Managers-Construction in the Oklahoma City/Stillwater area.  It is undisputed that under the MSG, corporate managers determine the parameters of an affected work group based on job title, similar job functions, geography, lines of organization, or other definable attribute, based on the needs of the business.  SWBT determined that Construction-Engineers and Construction-Contract Coordinators would be pooled together to form an affected work group.  Ms. Coffey does not present any evidence (indeed, she did not depose anyone concerning the decision to make this grouping) that calls this business judgment into question.  Nor does she suggest that the effect or purpose of this particular grouping was to subject older employees to the RIF.  Rather, Ms. Coffey herself contends that SWBT should not have made this grouping simply because, according to her, her job as a Contract Coordinator is different than that of an Engineer.  SWBT, however, is not precluded from grouping different jobs together, so long as it deems them sufficiently similar in some type of way that would make it appropriate, based on the needs of the business, to do so.  In short, Ms. Coffey's personal belief does not call into question the propriety of SWBT's decision.  *See Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1171 (10th Cir. 1998) ("Appellants may believe that [a corporation's] job coding should be by job qualification, not function performed, but it is not our place to disturb that kind of business judgment.").

-14-

Ms. Sanders argues that the Area Managers did not consider RIF criteria uniformly when they were determining employees' rankings within Band C of her affected work group. We have stated that the selective use of RIF criteria—to evaluate some employees' potential but not others', for example—"constitutes limited evidence of pretext." *Beaird*, 145 F.3d at 1174. The record, however, does not support Ms. Sanders's assertion.

SWBT policy, as articulated by the MSG, is to rank employees subject to the RIF (in this case, those falling into Band C) according to their "performance, skills, experience, and training." In addition, Mr. McNeely circulated a guide to his Area Managers that listed subsets of the MSG categories. For "skills," the guide listed "management skills," "technical skills," "supervisory skills," "effectiveness with others," "ability to handle a broader scope," and "promotional possibility." *Id.* Mr. McNeely also stated in his affidavit that the skills category included consideration of skills "above and beyond those required for the job." Similarly, Area Manager Mike Harris testified that "skills would be the things that you had that made you capable of doing your job, [including] any cross-experience that you might have." As to the MSG's other two ranking categories, Mr. McNeely's memo stated that the "experience" category encompasses "NCS" and "equivalent work experience." The "training" category includes "formal company training" and "formal technical or trade school."

On September 26, 2002, the Area Managers held a meeting and ranked all of the Band C employees in affected work groups. Their ranking decisions were unanimous. Because there is no contemporaneous document detailing the reasons for each employee's particular ranking, Mr. Wooten—one of the Area Managers who participated in the ranking meeting—provided an affidavit in this case that explained why each employee was ranked higher or lower than Ms. Sanders.

For example, the first-ranked employee in Band C in Ms. Sanders's affected work group "had been in his engineering position longer than Ms. Sanders, and his skill level was considered to be greater than Ms. Sanders." The second-ranked employee "had construction experience and was considered to be more versatile than Ms. Sanders." The sixth-ranked employee "had been promoted . . . from his cable splicing technician job. Even though he had not been an engineer as long as Ms. Sanders, he was able to learn his job very quickly due to his outside technical background. His skills were considered to be greater than Ms. Sanders." These explanations are consistent with SWBT's RIF policy, as outlined in both the MSG and the guide provided by Mr. McNeely.

Ms. Sanders appears to argue, however, that SWBT did not apply its RIF criteria consistently and uniformly across all of its employees. As evidence, she points out that she had been in an engineering position for more time than at least one person ranked ahead of her in Band C. She thus concludes that SWBT did

not consider her tenure when ranking her against that employee.

There is, however, no evidence to suggest that SWBT failed to consider her tenure. According to Mr. Wooten's affidavit, she was ranked lower than the other employee because he "had an outside construction background and prior supervisory experience. . . . His outside construction background enabled him to independently complete jobs. Ms. Sanders was not as autonomous." Although Ms. Sanders may have been in an engineering position longer than the other employee, an employee's tenure as an engineer was only one of many possible ranking criteria in the MSG categories of "performance, skills, experience, and training."

We therefore do not agree with Ms. Sanders's position. The descriptors used in Mr. Wooten's affidavit are entirely consistent with the criteria set forth in Mr. McNeely's ranking instructions. This fact distinguishes the present case from *Beaird* because SWBT's ranking method did not deviate from its stated policy. *See Beaird*, 145 F.3d at 1173–74.

Moreover, Mr. Wooten's affidavit is not evidence that SWBT inconsistently applied the RIF criteria. His affidavit's purpose is merely to illustrate why a specific employee was ranked higher than Ms. Sanders, not to provide a comprehensive list of all the ranking criteria assessed by SWBT's Area Managers. That the affidavit is selective in its detail is no indication that the RIF was

similarly selective. Again, this fact distinguishes this case from *Beaird*. *See id.* (explaining that selective use of RIF criteria *in identifying employees to be laid off* is evidence of pretext).

*Voluntary Demotion of an Area Manager*

Ms. Sanders also takes issue with the voluntary demotion of Rick Griffith from an Area Manager to a Manager-Engineer. We do not consider this to be evidence of pretext.

The Area Managers, including Mr. Griffith, knew that SWBT would be retaining only thirteen of the seventeen Band C Managers-Engineering in the Oklahoma City/Stillwater area. At the Area Managers' ranking meeting in September, the managers unanimously ranked Ms. Sanders thirteenth. Thus, at that time, she was considered "safe" from the RIF. After the ranking meeting, SWBT enacted a policy whereby an Area Manager who is subject to a RIF may take a voluntary demotion to an engineer position rather than risk being laid off. Also at this time, the Area Managers who had ranked the engineers knew that one of them (the Area Managers) would be laid off pursuant to the fall 2002 RIF. As the most junior Area Manager, Mr. Griffith considered himself to be the most likely candidate to lose his job, so he volunteered to be demoted to a Manager-Engineering. This demotion necessitated the surplus of an additional engineer from the group. Ms. Sanders, as the next-lowest ranked engineer, was selected to

be surplussed.

Although Ms. Sanders contends that Mr. Griffith "basically was able to pick who was going to be surplussed as a result of his stepping down," we find nothing about his decision or the enactment of the policy itself that is indicative of pretext. Because the voluntary-demotion policy was not enacted until after the ranking meeting, at the time Mr. Griffith ranked Ms. Sanders he thought she would be retained. Further, there is no evidence that suggests Mr. Griffith took a demotion because he wanted Ms. Sanders, as a woman, to be surplussed. Therefore, his transfer into Ms. Sanders's engineering group does not call into question the nondiscriminatory purpose of the RIF as asserted by SWBT.

*Statistical Evidence*

There were 102 first-level managers in the Oklahoma C&E group prior to the fall 2002 RIF. Nineteen were women and eighty-three were men. Ten of the nineteen women, or 52%, were surplussed. Eleven of the eighty-three men, or 13%, were surplussed. Ms. Sanders and Ms. Coffey suggest that sex discrimination can be inferred because a greater percentage of women were selected for the RIF.

"Statistics taken in isolation are generally not probative of age discrimination." *Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 979 (10th Cir. 1996) (quotations omitted). Specifically, "[s]tatistical evidence which fails to properly

-19-

take into account nondiscriminatory explanations does not permit an inference of pretext." *See id.* Thus, "[s]tatistical evidence that does not adjust for the various performance evaluations and departmental rankings of the employees included in the statistical pool" is insufficient to establish pretext. *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1197–98 (10th Cir. 2006).

The district court correctly noted that the plaintiffs' statistical evidence does not take into consideration nondiscriminatory explanations for the disparity—for example, differences in various individuals' job performance, experience, and training. Because the statistics fail to account for these variables, they do not constitute evidence of pretext. *See id.* (in RIF case, statistical evidence that fourteen of nineteen terminated employees were over forty years old is not evidence of pretext because the statistics do not account for individuals' skills or prior performance); *see also Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1456 (10th Cir. 1994) ("Plaintiff's statistical evidence compares only the ages of employees retained with the ages of those laid off. . . . Plaintiff's statistical evidence fails to eliminate nondiscriminatory explanations for disparate treatment—*i.e.*, that those laid off had lower performance evaluations and rankings than those retained—and therefore does not permit an inference of pretext."); *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 987 (10th Cir. 1996) (not permitting an inference of pretext where "[p]laintiffs' statistics grouped all

employees together regardless of specialty or skill and failed to take into account nondiscriminatory reasons for the numerical disparities.").

### III.  DISMISSAL OF SBC

A plaintiff must serve a defendant with a summons and a copy of the complaint within 120 days after the filing of the complaint.  Fed. R. Civ. P. 4(m).  If service is not made within 120 days, the court:

> on motion or on its own after notice to the plaintiff[,] must dismiss the action without prejudice against that defendant or order that service be made within a specified time.  But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

*Id.*  We review for abuse of discretion the district court's dismissal of a defendant for improper service.  *See Scott v. Hern*, 216 F.3d 897, 912 (10th Cir. 2000).

Here, the district court sua sponte dismissed SBC for insufficient service of process and was therefore required to give prior notice to the plaintiff under Rule 4(m).[7]  Among other things, the notice requirement affords the plaintiff the opportunity to show good cause for improper service.  *See Espinoza v. United States*, 52 F.3d 838, 841 (10th Cir. 1995) ("The preliminary inquiry to be made under Rule 4(m) is whether the plaintiff has shown good cause for the failure to

---

[7]The court's order indicates that SBC had moved for dismissal.  In fact, SBC had not done so.  Rather, SWBT had stated in footnotes to several of its filings that "SBC Communications, Inc. has not yet been served. . . . SBC Communications, Inc. [was not] the Plaintiffs' employer.  Plaintiffs' employer was SWBT."

timely effect service."). "If good cause is shown, the plaintiff is entitled to a mandatory extension of time. If the plaintiff fails to show good cause, the district court must still consider whether a permissive extension of time may be warranted." *Id.* Indeed, a court must expressly consider a plaintiff's argument regarding good cause, because "[w]ithout anything in the record to indicate how the district court made its determination with respect to the good cause exception . . . appellate review is impossible." *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1459 (10th Cir. 1995).

In this case the district court did not notify the plaintiffs of its intention to dismiss SBC for improper service. In its order of dismissal, the district court also concluded, without explanation, that the plaintiffs had not served SBC and had not shown good cause regarding their failure to do so. Because the district court did not give the plaintiffs an opportunity to argue that they did, in fact, serve SBC or that they had good cause not to, the district court abused its discretion in sua sponte dismissing SBC.

## IV. CONCLUSION

We REVERSE the entry of summary judgment in favor of SWBT on Ms. Sanders's age discrimination claim. Because none of the plaintiffs have demonstrated that SWBT's RIF was a pretext for sex discrimination, we AFFIRM the district court's entry of summary judgment in favor of SWBT on those claims.

We similarly AFFIRM the summary judgment order as to Ms. Coffey's and Ms. Brooks's age discrimination claims. Finally, we REVERSE the district court's sua sponte dismissal of SBC as a defendant and REMAND for further proceedings not inconsistent with this opinion.

**McKAY**, Circuit Judge, *concurring in part and dissenting in part*.

In this summary judgment case, I view the applicable law and the record differently from the majority and must, therefore, respectfully dissent. I agree with the majority that this is a circumstantial case, and I agree with the majority's disposition of all claims except the gender discrimination claims of Ms. Sanders and Ms. Coffey, and I conclude Ms. Sanders has established sufficient circumstantial evidence of age discrimination in addition to her direct evidence to survive summary judgment.

We are required to consider the totality of the circumstantial evidence when considering claims of pretext. *Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159, 1174 (10th Cir. 1998). If the proffered evidence, when viewed in the aggregate, is "sufficient to raise a genuine doubt about a [d]efendant's motivation," we may conclude a plaintiff "has met the requirements necessary to a showing of pretext." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1220 (10th Cir. 2002) (internal quotation marks omitted). "A showing that the employer's justifications for its behavior are pretextual permits a finding of intentional discrimination, but does not compel it." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004).

Generally, "[a] plaintiff demonstrates pretext by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005) (internal quotation marks omitted); *Garrett*, 305 F.3d at 1217. "[E]vidence of pretext may include, but is not limited to . . . prior treatment of plaintiff; . . . disturbing procedural irregularities (e.g., falsifying or manipulating . . . criteria); and the use of subjective criteria." *Garrett*, 305 F.3d at 1217 (final alteration in original) (internal quotation marks omitted).

Specifically, in *Beaird v. Seagate Technology, Inc.*, we delineated three principal ways a plaintiff can demonstrate pretext in a RIF case. 145 F.3d at 1168. In my view, two of them apply in this instance. "First, [a plaintiff] can argue that her own termination does not accord with the RIF criteria supposedly employed,"[1] even when an employer gives a business judgment reason for changing its RIF criteria midstream. *Id.* Although an employer "may choose to conduct its RIF according to its preferred criteria" rather than criteria previously documented by the employer, the employer's application of or deviation from the documented RIF criteria is not immune to judicial review and may be "so idiosyncratic or questionable that a factfinder could reasonably find that it is a

---

[1] In *Beaird*, the RIF criteria supposedly employed were the procedures described in the employers handbook. *See id.* at 1162. *Beaird* was analyzing a termination not in accord with that policy. *See id.* at 1168.

pretext for illegal discrimination." *Id.* at 1169. Selective application of documented or undocumented RIF criteria may indicate pretext. *See id.* at 1173–74.

Here, as in *Beaird*, Defendant claims to have followed its written RIF criteria. Specifically, Defendant's four main RIF criteria are listed in the MSG as "performance," "skills," "experience," and "training." (R. at 370, Management Staffing Guidelines at 9.) The MSG expressly allows Defendant to add RIF criteria, and Mr. McNeely did so in a ranking considerations instruction sheet he sent to area managers. The ranking considerations sheet listed specific subcategories of the four general RIF criteria listed in the MSG for area managers to consider when ranking Band C managers. After litigation ensued, Defendant provided affidavits from several managers listing RIF subcategories previously undocumented in the MSG or on the ranking considerations sheet as their reasons for ranking certain employees above others within Band C. Although these reasons were certainly related to the four main RIF criteria, in my view, they were not consistent with the written subcategories found in Mr. McNeely's ranking instructions. I refer to these criteria as the "undocumented RIF criteria" because they were not specifically documented in any of the contemporaneous documents relied on by Defendant when ranking employees.

The second method a plaintiff can employ to demonstrate pretext in a RIF

case is to present evidence that her "evaluation under [a] defendant's RIF criteria was deliberately falsified or manipulated" to affect her employment status negatively. *Id.* at 1168. "One method of demonstrating manipulation or falsification of evaluation is to produce evidence that a supervisor responsible for assessing her performance displayed ageist [or gender] animus." *Id.*

In addition to these principal methods for demonstrating pretext, our cases explain three other relevant indications of pretext. First, "[w]hen an employer's RIF criteria include job categorization, an employer must explain the basis for that categorization or risk a finding of pretext." *Id.* at 1170. Second, the extent of apparent procedural irregularities with respect to the employee's selection for the RIF may indicate pretext. *Whittington v. Nordam Group Inc.*, 429 F.3d 986, 994 (10th Cir. 2005); s*ee also Plotke v. White*, 405 F.3d 1092, 1104 (10th Cir. 2005); *Garrett*, 305 F.3d at 1220. Third, inconsistencies in an employer's explanation of the reasons for its negative employment action may also indicate pretext. *Id.*

Thus, in analyzing Plaintiffs' claims, the court should focus its pretext analysis on the aforementioned five categories: (1) selective application of RIF criteria, (2) manipulation of employee evaluations under RIF criteria, (3) inadequate employer explanation for job categorizations, (4) RIF procedural irregularities, and (5) inconsistent employer reasons for surplussing.

**Circumstantial Evidence as to Ms. Sanders**

Ms. Sanders produced circumstantial evidence related to age and gender discrimination in four of the five pretext categories the court should consider. I conclude Ms. Sanders has produced evidence supporting a finding of pretext in three of those four categories.

Selective Application of RIF Criteria

To survive summary judgment in this category, Ms. Sanders needed to show Defendant's application of or deviation from its RIF criteria was so "idiosyncratic or questionable that a factfinder could reasonably find that it is pretext for illegal discrimination." *Beaird*, 145 F.3d at 1169. Deviation from documented RIF criteria alone does not support an inference of pretext. However, selective or non-uniform application of either documented or undocumented criteria may be sufficient to support such an inference.

When an employee provides sufficient circumstantial evidence to support a finding of pretext due to an employer's selective application of its chosen RIF criteria, the employer may then attempt to meet the *Reeves* burden of providing abundant and uncontroverted evidence that no discrimination occurred to rebut the employee's pretext claim and to preserve the employer's claim of being entitled to summary judgment. I would hold that an employer has provided abundant and uncontroverted evidence of its non-discriminatory RIF criteria

application if the employer can document an observable pattern of RIF criteria application that shows the employer applied the same criteria to a large majority of its at-risk employees. When, as I see in this case, an employer selectively applies any RIF criteria favoring a minority of employees, who then finish with a higher rank than those surplussed, I would hold an employer did not meet its burden of presenting abundant and uncontroverted evidence of no discrimination to preserve its claim for summary judgment.

In this case, Defendant's MSG states repeatedly that managers should use criteria such as performance, skills, experience and training as benchmark RIF criteria.[2] Early in litigation, Defendant explained managers ranked Band C employees "from high to low based on their performance, skills, experience, and

---

[2]
> Organizations with a surplus condition must identify those employees who will be surplussed.
>
> Criteria such as performance, skills, experience and training, remain key to the selection of managers for staffing the organization. . . .
>
> In order to evaluate employees, the following steps must be followed and documented as indicated:
> 1. Those managers in an affected work group potentially subject to being declared surplus should be selected **based on criteria such as performance, skills, experience and training.** Initially, employees should be assigned to one of . . . four bands:
> . . .
> Managers should be listed in order from high to low based upon criteria such as performance, skills, experience and training . . . .

(R. at 370, Management Staffing Guidelines at 9.)

-6-

training." (R. at 181, Def. SWBT's Mot. for Summ. J. and Br. in Supp. at 10.) Mr. McNeely claims he followed the MSG process for the RIF and instructed area managers to rank Band C employees using performance, skills, experience, and training criteria. Two of Defendant's area managers, Mr. Alfred Saenz and Mr. Mike Harris, also claimed they used the four primary documented RIF ranking criteria.

Mr. McNeely also sent managers a ranking considerations sheet with a list of subset categories for the four main criteria to use when ranking their Band C managers.[3] The ranking considerations sheet explained that, because Defendant had already used the performance criterion to calculate the band ratings, managers should use only the remaining three RIF criteria and their subcategories for ranking purposes. The ranking considerations sheet expressly instructed area managers to "[u]se the Skills, Experience and Training sections below in order to help in determining the ranking of the C band." (R. at 233, Ranking Considerations at 1.)

Defendant claims it used its RIF criteria to rank Ms. Sanders and the other

_____

[3] The subcategories for skills consisted of management skills, technical skills, supervisory skills, effectiveness with others, ability to handle a broader scope of responsibility, and promotional possibility. Experience subsets were years of service and equivalent work experience. Training subcategories were formal company training, formal technical or trade school, and any degrees earned in school.

employees in her group. However, Defendant's specific explanation, proffered after litigation ensued, for why certain employees were ranked above Ms. Sanders included several factors not listed in either the MSG or on the ranking considerations sheet provided by Mr. McNeely. Specifically, Defendant proffered twelve categories of undocumented criteria and one category of documented criteria to explain why twelve of Ms. Sanders' peers, four of whom were younger and male, six of whom were older and male, and two of whom were younger and female, were ranked ahead of her. Although this fact alone does not support an inference of pretext, the record strongly supports an inference that Defendant did not apply these criteria uniformly to each employee when ranking twelve employees ahead of Ms. Sanders. In my view, using criteria not listed on the ranking considerations sheet and not considering all three content areas as instructed constituted a deviation from the RIF criteria "supposedly employed." *Beaird*, 145 F.3d at 1168. I conclude Defendant then applied its chosen RIF criteria selectively.

The highest level of selectivity Defendant employed was when it applied six of the twelve undocumented criteria only once to six different employees ranked above Ms. Sanders and did not apply any of those six undocumented

categories to any of the other eleven employees ranked ahead of Ms. Sanders.[4]

Defendant applied three of the undocumented criteria to only two other employees.[5] Defendant applied one undocumented criterion to three other employees who outranked Ms. Sanders.[6] At best, the largest number of employees out of the twelve ranked ahead of Ms. Sanders that Defendant applied undocumented criteria to was five employees.[7]

Moreover, I am of the view that this inference of a selective, non-uniform approach is uncontroverted by the record. Indeed, there is little to no evidence from the area managers' meeting indicating they discussed the undocumented criteria at all. The sketchy notes from that meeting support an inference that they did not uniformly apply their chosen criteria to a large majority of at-risk employees.

---

[4] These criteria were as follows: having a civic engineering background, learning the job quickly, having a technical splicing background, being experienced in cable repair, having experience in the control management center, having outside plant technical experience, and having drafting and CAD experience.

[5] The three undocumented criteria used only twice were as follows: having longer time in an engineering position, installation and repair experience, and construction experience.

[6] The one undocumented criterion Defendant applied to three employees was having outside plant technical experience.

[7] These two criteria were having greater skill level and being more versatile.

Specific examples of employees who outranked Ms. Sanders according to these undocumented criteria are as follows. First, Defendant ranked Mr. Michael Heatley higher than Ms. Sanders using the undocumented criteria of having "greater" skills. Even though Mr. Heatley did not have an extensive engineering background, he was considered to have greater skills because he learned quickly. (R. at 304, Harris Aff. 4 ¶11.) Yet the record indicates Defendant used Ms. Sanders to train new engineers rather than Mr. Heatley, whom Defendant indicated had greater skills.

Second, Defendant listed outside construction background as the undocumented criteria for ranking Mr. Alton Miller ahead of Ms. Sanders. Ms. Sanders trained Mr. Miller in 2002 when he was on a PIP for misconduct in his prior supervisory position. Mr. Miller had less time in his engineering position than Ms. Sanders. He had three months' experience in 1983 and eight months' in 2002 contrasted with Ms. Sanders' ten years as an engineer. Length of time as an engineer was one of the undocumented criteria area managers used to place Ms. Sanders below some of her other peers, yet they did not uniformly apply that same criteria when comparing her to Mr. Miller. In addition, Ms. Sanders' productivity was nearly three times higher than Mr. Miller's. Productivity was another undocumented RIF criterion Defendant used in its considerations when ranking employees because it appeared in handwritten notes from the ranking

meeting next to Ms. Sanders' name.

Third, like Ms. Sanders, Mr. Woody Harjo had no outside plant technical experience, but Defendant retained him. Defendant ranked Mr. Harjo higher than Ms. Sanders and Ms. Nancy Bounds, who was also surplussed. According to the undocumented criteria, Ms. Bounds, like Ms. Sanders, was ranked lower because of having no outside plant experience. Even though neither Ms. Sanders, Ms. Bounds, nor Mr. Harjo had outside plant technical experience, Mr. Harjo was retained for his drafting and CAD background which Defendant claimed made him more versatile than either Ms. Sanders or Ms. Bounds. (R. at 305–06, Harris Aff. 5–6 ¶11.) Ms. Bounds had a drafting background, and as noted above, Ms. Sanders supervised drafting clerks. The record does not indicate if Ms. Sanders' or Ms. Bounds' drafting experience included CAD work.

Thus, the non-uniform application of undocumented RIF criteria when cross-comparing employees during ranking, little to no evidence from the area managers' ranking meetings indicating that they discussed the undocumented criteria at all and, finally, the existence of only sketchy notes regarding the criteria they did discuss when ranking employees all would combine to provide a reasonable juror with sufficient circumstantial evidence to support a finding of pretext in this area. In my view, Ms. Sanders' circumstantial evidence of this selective application strongly supports an inference of pretext.

Finally, because Defendant applied each of its chosen RIF criterion to less than a large majority of ranked employees, I conclude it did not provide abundant and uncontroverted independent evidence of non-discrimination and, therefore, cannot preserve its claim for summary judgment in this area.

RIF Procedural Irregularities

I am of the view that Ms. Sanders provided circumstantial evidence of RIF procedural irregularities in two areas. First, Ms. Sanders points to Mr. Griffith's participation in the ranking meeting in which Ms. Sanders was ranked thirteenth in the Band C pool of employees. The area managers knew before the ranking meeting Defendant would retain a specified number of first-level managers in Bands A–C. In fact, Defendant planned to retain all Band A and B managers but only thirteen Band C managers. The evidence supports an inference that Mr. Griffith knew he was likely to be surplussed from his position as an area manger because he was the least senior area manager. After participating in the ranking meeting, Mr. Griffith requested, pursuant to a policy adopted after the ranking meeting, a voluntary demotion from an area manager to a first-level manager in Ms. Sanders' group to avoid being surplussed as an area manger during the RIF. Even though he was demoted, Mr. Griffith experienced no change in salary. I agree with the majority that Mr. Griffith's demotion does not, by itself, provide support for a finding of pretext under irregular RIF procedures because Defendant

-12-

is entitled to use its business judgment to create policies regulating transfers and to transfer employees according to those policies for legitimate business purposes. Moreover, the record provides no evidence that Mr. Griffith's demotion was not conducted pursuant to a legitimate business decision.

Nevertheless, in my view, an inference of pretext arises from Mr. Griffith's participation in the area managers' ranking meeting at a time he knew his job was vulnerable and knew he might be transferring into the group of employees he helped to rank. Mr. Griffith was a decision maker at the meeting in which Defendant ranked Ms. Sanders thirteenth, after twelve other individuals who were either male or younger than Ms. Sanders, or both. I find Mr. Griffith's involvement in the decision to rank Ms. Sanders thirteenth to be irregular when he knew she would be the next person surplussed if the total size of her manager group increased. That knowledge and Mr. Griffith's subsequent request for a transfer to Ms. Sanders' group combine to constitute a procedural irregularity that provides some support for a finding of pretext under the totality of the circumstances standard.

Second, Ms. Sanders provided circumstantial evidence of a procedural irregularity with respect to one topic of possible discussion at the area managers' ranking meeting. That topic was age. Mr. Wooten claimed he did not know the ages of the engineers who reported to him and that age was not a factor in the

rankings, yet his notes from the meeting indicated six pension-eligible employees with a star. Although pension eligibility is not necessarily connected to age, it is sufficiently related under the circumstances of this case, to allow a reasonable juror to infer the area managers discussed age when discussing pension eligibility during the meeting. While this evidence, standing alone, would be insufficient to support a finding of pretext, under the totality of the circumstances standard, a reasonable juror could examine it along with the other evidence and infer from it that the area managers discussed age at the meeting.

Inconsistent Employer Reasons for Surplussing

If an employer offers inconsistent reasons for surplussing, we consider "(1) the timing of the change in position and (2) the evidentiary basis for the new rationale." *Jamarillo*, 427 F.3d at 1311. A change in explanation occurring after significant legal proceedings have occurred supports an inference of pretext. *Id.*

Defendant gave numerous reasons at different times for surplussing Ms. Sanders. First, Mr. Wooten allegedly told Ms. Sanders directly that she was surplussed because of her age. However, in his affidavit and on his ranking notes, Mr. Wooten indicated Ms. Sanders' productivity was the problem. Defendant elsewhere stated that Ms. Sanders' lack of outside plant technical experience, work experience, and technical skills were the factors that led to her being surplussed. For instance, Mr. Harris stated that "Ms. Sanders' ranking was

-14-

primarily attributable to her non-technical background. A technical background is extremely valuable to an engineer's working knowledge of outside plant facilities. Ms. Sanders was at a disadvantage since she did not have outside plant experience." (R. at 304, Harris Aff. 4 ¶11.)

Defendant provided its age and productivity reasons during the RIF process both in Mr. Wooten's conversation with Ms. Sanders and in the notes from the ranking meeting. However, Defendant's later, inconsistent explanation was provided after Ms. Sanders filed suit. I find this change in explanation supports a finding of pretext because Defendant's rationale changed after significant legal proceedings had occurred.

Conclusion as to Ms. Sanders

Viewing the evidence in the light most favorable to Ms. Sanders and under the totality of the circumstances standard, I conclude Ms. Sanders has produced a strong case of circumstantial evidence to support a finding of pretext. I am of the view that Defendant has not produced abundant and uncontroverted evidence showing discrimination did not occur and cannot preserve its claim of being entitled to summary judgment as a matter of law. Therefore, I would reverse and remand on both Ms. Sanders' age and gender discrimination claims.

**Circumstantial Evidence as to Ms. Coffey**

Ms. Coffey produced circumstantial evidence of discrimination in four of

-15-

the five categories the court should analyze. However, because Ms. Coffey was not ranked against any younger employees, I agree with the majority that her age discrimination claim cannot survive summary judgment. I therefore analyze the circumstantial evidence only with regard to her gender discrimination claim.

Selective Application of RIF Criteria

In Ms. Coffey's case, as in Ms. Sanders', I find Defendant's explanation for its rankings is based on specific criteria undocumented in the MSG or on the ranking considerations sheet. Like Ms. Sanders, Ms. Coffey claims Defendant selectively applied its undocumented RIF criteria to preserve jobs for male employees.

The five undocumented criteria Defendant proffered for ranking five men ahead of Ms. Coffey were having engineering experience, managing the job well, being more versatile, getting along better with a boss, and having outside technical experience. Defendant also considered supervisory experience, one of the documented criteria found on the ranking considerations sheet. Like Ms. Sanders, Ms. Coffey provides sufficient circumstantial evidence to support a finding of pretext in Defendant's selective application of its chosen RIF criteria.

Specifically, Defendant applied three of the five undocumented criteria only once to three different employees ranked ahead of Ms. Coffey and did not apply those same criteria to the other two employees ranked ahead of Ms.

-16-

Coffey.[8]  Defendant applied the other two criteria to only two employees ranked ahead of Ms. Coffey.[9]  Defendant applied none of these undocumented criteria to a large majority of at-risk employees.

Specific examples of the selective applications are as follows.  Defendant ranked Mr. Roger Cox ahead of Ms. Coffey using one undocumented criterion.  It stated Mr. Cox had a diverse working background and was thus more versatile than Ms. Coffey.  Defendant cites to this criterion only one other time, when describing Mr. Steven Parrot.  There is no mention of this undocumented criterion for any of the other three candidates ranked ahead of Ms. Coffey.  Thus, the court has no way of knowing whether any of the other candidates ranked ahead of Ms. Coffey also had a more diverse work background.  In my view, therefore, it was not uniformly applied.

Defendant also ranked Mr. Rolland King higher than Ms. Coffey because he managed his job well and because his boss was not having problems with him like Mr. Harris claimed he was having with Ms. Coffey.  These two undocumented RIF criteria do not appear in the record in regard to any other

---

[8] The three undocumented criteria Defendant used only once were having engineering experience, managing the job well, and getting along better with a boss.

[9] These categories were being more versatile and having outside technical experience.

person ranked higher than Ms. Coffey. Thus, they were not uniformly applied. In addition, Mr. Harris' statement that he was having problems with Ms. Coffey is possibly in conflict with Mr. Harris' evaluation of Ms. Coffey just nine months before when he wrote, "Ms. Coffey continues to learn and grow in her job. She works well with others and is a team player." (R. at 311, Exhibit 7-B at 2.)

Finally, Defendant ranked Mr. John Starwalt higher than Ms. Coffey because he had more engineering experience and an outside technical background. The record indicates Defendant applied the engineering experience criterion only to Mr. Starwalt, and it applied the outside technical background criterion only to one other person ranked higher than Ms. Coffey. Again, I conclude Defendant selectively applied undocumented RIF criteria.

Accordingly, I am of the view that Ms. Coffey has provided sufficient circumstantial evidence to support a finding of pretext in Defendant's selective application of undocumented RIF criteria. Because I see no observable pattern of RIF criteria application to a large majority of Defendant's at-risk employees, I conclude Defendant has not produced abundant and uncontroverted evidence of non-discrimination and thus cannot preserve its claim for summary judgment in this area.

Manipulation of Employee Evaluation

A reasonable juror can draw an inference that an employer has manipulated

-18-

its evaluation of an employee under its RIF criteria if the record indicates evidence of gender animus on the part of a supervisor with power to assess an employee's job performance. *See Beaird*, 145 F.3d at 1168. Inherent gender animus can warp a supervisor's evaluation of an employee. In this case, Mr. Harris was Ms. Coffey's immediate supervisor, and Ms. Kaylan Collins stated that she personally overheard Mr. Harris make "sexist remarks about female employees/managers." (R. at 1003, Collins Aff. 2 ¶10.) Ms. Collins' statement alone is sufficient to support a finding of pretext in this area.

Moreover, Ms. Coffey presented other evidence that, viewed in the light most favorable to her and under the totality of the circumstances, provides some support for an inference of pretext in this category. For instance, Ms. Coffey stated in her affidavit that Mr. Harris scrutinized female employees more closely than male employees. She claimed a male employee noticed the same behavior in Mr. Harris and mentioned it to her. Ms. Coffey also claimed that Mr. Harris rarely encouraged her in her work, and she believed he did not want to deal with women. Finally, Ms. Coffey stated in her deposition that another female employee had been told by Mr. Harris that she was a nice looking woman, and that if she dressed up and went for an "after hours' interview" with the hiring manager, he thought she could probably get the job she was seeking. (R. at 759, Coffey Dep. 109:11–15.)

Inadequate Employer Explanation for Job Categorization

Defendant grouped employees in Ms. Coffey's job category by job title, Manager–Construction. That job title included two subsets: construction managers, who supervised Defendant's internal cable technician employees, and contract coordinators, who oversaw outside independent contractors in fulfilling Defendant's cable work orders. Ms. Coffey was a contract coordinator, as were three of the five employees against whom she was ranked. The record indicates that a fourth employee was a construction manager, but there is a dispute regarding whether the fifth employee was a construction manager or a contract coordinator.

The Defendant's MSG required it to group employees according to their "affected work group," which the MSG defined as a portion of the organization at the same level, job title, similar job function, geography, and line of organization. (R. at 471, P's. Combined Resp. to D's. Mot. for Summ. J. at 15; R. at 363, MSG at 2 (Note).) Defendant argues it permissibly grouped construction managers and contract coordinators under the same job title because they had the same job function. Ms. Coffey asserts her day-to-day functions as a contract coordinator differed significantly from that of a construction manager. For example, construction managers worked with Defendant's internal crews of cable

technicians and provided supervision for them. Whereas Ms. Coffey, as a contract coordinator, had no supervisory authority and worked with several independent contractors at various job sites on any given day to ensure their compliance with Defendant's contracted work orders.

This contrast is important because Defendant's explanation for ranking two employees above Ms. Coffey—the two employees who were or who were alleged to be construction managers—included the criterion of prior supervisory experience, which Ms. Coffey allegedly could not obtain as a contract coordinator. Based on Defendant's use of this criterion to rank construction managers over Ms. Coffey, in my view, Defendant's grouping of the two job subsets under one title could support a finding of pretext.

RIF Procedural Irregularities

Ms. Coffey alleges Defendant applied a permissible RIF procedure in an irregular manner. Specifically, Defendant allowed its area managers to reevaluate all employees prior to the RIF if the managers thought a reevaluation was necessary. In so doing, they had the latitude to raise or to lower an employee's rating.[10] This was likely to affect the employee's risk of being surplussed, given

---

[10]Absent evidence that the area manager's subjective power to raise or lower any employee's evaluation lapses once a RIF is declared, we must assume that power continues.

that only employees rated as "average" and therefore placed in Band C were vulnerable during this RIF. The reevaluating procedure itself was not irregular. However, Ms. Coffey argues, and I agree, that she has provided sufficient evidence to support an inference that her supervisor used this procedure in an irregular manner.

Mr. Harris reevaluated one of Ms. Coffey's younger, male peers who had been rated as "average" before the RIF, and raised him to an "above average," Band B rating, thus saving him from possible surplussing. Yet, Mr. Harris did not lower the ranking of another male employee, Mr. Dewayne Hendricks, who had demonstrably poor performance during the RIF period. The action or inaction standing alone would not suffice to show irregularity. However, a jury could find it to be irregular that Mr. Harris exercised his power to improve his evaluation of one employee, based on his subjective determination that the employee's performance merited reappraisal, yet did not exercise that same power to reevaluate another employee once he learned about that employee's mismanagement during the RIF period.[11] In my view, Ms. Coffey has provided

---

[11] I must note that Defendant disputes Mr. Harris' knowledge of the employee's misbehavior during the RIF period. However, we must view the facts in the light most favorable to Plaintiffs in this appeal from summary judgment. According to Ms. Brooks' deposition testimony, Mr. Hendricks reported Mr. Harris told him during the RIF process that "if his production did not improve,
(continued...)

sufficient evidence to support a finding of pretext based upon this procedural irregularity.

Conclusion as to Ms. Coffey

Viewing this evidence in the light most favorable to Ms. Coffey and under the totality of the circumstances standard, I conclude Ms. Coffey has produced sufficient circumstantial evidence in all four categories for which she produced evidence to support a reasonable juror's finding of pretext as to gender discrimination. In addition, I find Defendant has not produced abundant and uncontroverted evidence showing discrimination did not occur and, therefore, cannot preserve its claim of being entitled to summary judgment as a matter of law.

For the reasons stated, I would hold that both Ms. Sanders and Ms. Coffey are entitled to trial on the gender claim and that Ms. Sanders has presented additional circumstantial support for her age claim.

---

[11](...continued)
that [Mr. Harris] could easily put his name on the list and take [Ms. Coffey] off." (R. at 912, Brooks Aff. 137:1–8.) This testimony creates a triable issue of fact on this point.

-23-